United States District Court<br>Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY C. SWAN,<br><br>     Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br><br>     Defendant. | Case No. 15-cv-03558-JCS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 18, 21 |

## I.    INTRODUCTION

Plaintiff Kimberly Swan seeks review of the final decision of Defendant Carolyn Colvin, Commissioner of the Social Security Administration (the "Commissioner"), denying her applications for disability insurance and Supplemental Security Income benefits under Titles II and XVI of the Social Security Act.  For the reasons stated below, the Court GRANTS in part and DENIES in part Swan's Motion for Summary Judgment in part, DENIES the Commissioner's Cross-Motion for Summary Judgment, and REMANDS the case to the Commissioner for further proceedings consistent with this Order.[1]

## II.    BACKGROUND

### A.    Factual Background

Swan worked from May 2004 to September 2011, providing laundry services for a nonprofit homeless shelter.  Administrative Record ("AR," dkt. no. 13) at 247.  In May 2009 and December 2010, Swan injured to her lower back, hips, and knees while working.  *See id.* at 367, 382.  Following her 2010 injury, Swan was placed on temporary disability and retained that status until she was discharged.  *See id.* at 398, 438.  Swan was also treated for mental health

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c)

issues during that period.  *See id.* at 280–342.  Swan was terminated by the nonprofit in September 2011 and she applied for Social Security benefits three months later.  *See id.* at 209–24.

From September to October 2012, Swan worked part-time as a cashier at a Kentucky Fried Chicken.  *See id.* at 37, 225–29.  She stopped working as a cashier due to pain.  *See id.* at 37–38.

### 1.  Evaluation of Swan's Physical Injuries

Following her 2010 workplace injury, Swan received treatment from Dr. John Maki. *See AR* at 441–76.  Dr. Maki observed that Swan had experienced back, hip, and knee injuries. *See id.*  He further noted that Swan's injuries required modifications and limitations to her work. *See id.*  Dr. Maki also referred Swan to Dr. Fred Naraghi for evaluation of her back injuries. *See id.* at 382–88.

Dr. Diokson Rena evaluated Swan for her back, hip, and knee injuries on March 3, 2011, and diagnosed her with right hip pain and capsulitis, a right sacroiliac joint sprain with arthropathy, and lumbar disc disease.  *See id.* at 367–70.  Dr. Rena opined that Swan was limited to "modified duty" and, if no modified duty was available, she was temporarily totally disabled. *Id.* at 369.

Dr. Naraghi evaluated Swan's for back injuries on March 7, 2011.  *Id.* at 382–88.  Dr. Naraghi diagnosed her with worsening back and right leg pain accompanied by numbness in her right lower extremity.  *Id.* at 439.  He also diagnosed her with right leg radiculopathy and radiculitis.  *Id.* at 439.  He further noted that he needed an MRI of Swan's spine to complete his evaluation and stated that she was unable to return to work until his evaluation was completed. *Id.* at 439–40.

Dr. Naraghi evaluated Swan again in April 2011.  *See id.* at 374–79.  Dr. Naraghi noted that he had not yet reviewed an MRI of Swan's spine because his MRI request had not been approved by Swan's insurance provider.  *Id.* at 374–76.  He also stated that he needed an x-ray to complete his evaluation.  *Id.*  He transferred Swan back to Dr. Maki until he could review the requested MRI and x-ray, but reiterated that Swan was "unable to return to work until further evaluation." *Id.*

In May 2011, Swan saw Dr. Rena for a follow-up evaluation.  *See id.* at 362–64.  Dr. Rena

United States District Court
Northern District of California

1  again noted Swan's ailments, which had not changed since her March evaluation.  *Id.* at 363.

2  Regarding Swan's work status, Dr. Rena stated, "I will transition the patient to return to regular

3  duty on a trial basis until the next follow-up."  *Id.*  Dr. Rena also noted that Swan's injuries were

4  slowly improving.  *Id.* at 364.

5       Dr. Rena conducted another follow-up evaluation on September 2, 2011.  *See id.* at 352–

6  56.  The only ailment noted by Dr. Rena from this examination was lumbar disc disease.  *Id.*

7  at 354.  Dr. Rena further observed, "Permanent work preclusions are not indicated.  [¶]  I feel

8  [Swan] can continue in her usual and customary work as a service coordinator."  *Id.* at 355.

9       Dr. Rena again evaluated Swan in January 2012.  *Id.* at 346–48.  After observing that Swan

10  had lumbar disc disease and a right sacroiliac joint sprain, Dr. Rena stated that Swan's work status

11  remained "the same as per her final report.  She is on regular duty and is to continue with the

12  regular duty status."  *Id.* at 347.

13       On January 10, 2013, Dr. Brenden P. Morley conducted an in-person qualified medical

14  evaluation of Swan's physical and psychological health.  *Id.* at 421–24.  Dr. Morley diagnosed

15  Swan with bilateral knees featuring internal derangement and opined that she likely had a lumbar

16  herniated disc with radiculopathy.  *Id.* at 424.  Two months later, Dr. Morley supplemented this

17  evaluation with an extensive review of Swan's medical history and a report in which he opined

18  that Swan's lumbar spine had reached a point of maximum medical improvement.  *Id.* at 410–17.

19  He also explained that Swan's case was "complex and extraordinary because [her] symptoms are

20  greater than what one would find related to a simple and straightforward diagnosis."  *Id.* at 416.

21  Dr. Morley opined that Swan "will not be able to return to her pre-injury occupation."  *Id.* at 415–

22  16.  Dr. Morley also recommended that Swan receive orthopedic treatment for her bilateral knees.

23  *Id.* at 416.

24       On January 26, 2013, Dr. Todd Nguyen conducted a consultative examination of Swan's

25  spine and joints.  *Id.* at 403–06.  Dr. Nguyen observed, "Objectively the range of motion in the

26  lumbar spine is moderately reduced.  Neurological exam is with normal strength . . . ."  *Id.* at 406.

27  Regarding her functional capacity, he opined that Swan was able to walk, stand, and sit for six

28  hours if she had a break every two hours; she was able to lift twenty pounds frequently and fifty

pounds occasionally; she should be able to bend and stoop occasionally, and no modification to her environment or assistive device was required for her to work. *Id.*

On January 30, 2013, Dr. Timothy Lo conducted an electrodiagnostic examination of Swan's lower extremity symptoms. *Id.* at 418–20. Dr. Lo opined that the results of his evaluation constituted a "grossly normal electrodiagnostic study." *Id.* at 420. Dr. Lo further noted that, while there was no electrodiagnostic evidence of it, Swan's history suggested that she likely suffered from right lumbar radiculopathy. *Id.*

### 2. Evaluation of Swan's Mental Health

Dr. Lynne Mc Innes psychiatrically evaluated Swan on September 1, 2011. *Id.* at 329–30. Dr. Mc Innes noted that she had treated Swan in the past and observed that Swan was suffering from recurrent depression and panic attacks. *Id.* Although Swan had been prescribed Citalopram in the past, she had stopped taking it after experiencing improvement in her depression symptoms. *Id.* Dr. Mc Innes resumed Swan's prescription for Citalopram and also prescribed Ambien. *Id.*

In May 2012, clinical psychologist Dr. Jennifer Eggert conducted a consultative examination of Swan. *See id.* at 391–94. Dr. Eggert diagnosed Swan with chronic posttraumatic stress disorder ("PTSD") and major depressive disorder ("MDD") that was recurrent and moderate. *Id.* at 392. She assigned Swan a global assessment of functioning ("GAF") score of 53 and observed that her prognosis was fair. *Id.* Dr. Eggert also specifically addressed Swan's work-related abilities, noting several moderate impairments in Swan's ability to function. *Id.* at 393. Dr. Eggert further opined that Swan:

> should be able to respond appropriately to coworkers, supervisors, the public, and any safety issues that might arise in a work situation. However, at present, [her] ability to tolerate the mental demands associated with work, or work-like settings, without deterioration or decompensation is not likely. Consequently . . . although she appears able to be successful at maintaining the skills required to carry out tasks in a work setting, her overall performance and ability to maintain relationships at work may be negatively impacted by her mental health.

*Id.*

Swan also received a consultative examination from Dr. Elizabeth Welchel in December 2012. *See id.* at 396–401. Dr. Welchel diagnosed Swan with MDD that was moderate and

recurrent, PTSD, and personality disorder. *Id.* at 400. She assigned Swan a GAF score of 55 and observed that Swan:

> is a depressed and traumatized woman who has some significant entitlement issues. . . . She is currently able to work in a fast food restaurant 25 hours per week, but is suffering some social interaction problems there . . . . [She] was previously in psychotherapy and on psychiatric medication to good effect.

*Id.* Dr. Welchel expected that Swan would "improve in the next twelve months with active psychotherapy and medication management." *Id.*

Dr. Welchel also functionally assessed Swan, determining that she was able to follow simple and complex job instructions. *Id.* at 401. She further determined that Swan had the following moderate impairments: relating and interacting with coworkers and the public; maintaining concentration and attention, persistence and pace; associating with day-to-day work activity; maintaining regular attendance in the work place and performing work activities on a consistent basis; and performing work activities without special or additional supervision. *Id.* Dr. Welchel also opined that Swan's ability to accept instructions from supervisors was mildly impaired. *Id.*

**B. Legal Background**

**1. Five-Step Analysis for Determining Physical Disability**

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof for steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At step one, the Administrative Law Judge ("ALJ") considers whether the claimant is

United States District Court
Northern District of California

1    presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).  If she is, the

2    ALJ must find that she is not disabled.  *Id.*  If she is not engaged in substantial gainful activity, the

3    ALJ continues the analysis.  *See id.*

4           At step two, the ALJ considers whether the claimant has "a severe medically determinable

5    physical or mental impairment," or combination of such impairments, which meets the

6    regulations' twelve-month duration requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  An

7    impairment or combination of impairments is severe if it "significantly limits [the claimant's]

8    physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  If the claimant

9    does not have a severe impairment, disability benefits are denied.  20 C.F.R. § 404.1520(a)(4)(ii).

10   If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step.

11   *See id.*

12          At step three, the ALJ compares the medical severity of the claimant's impairments to a

13   list of impairments that the Commissioner has determined are disabling.  20 C.F.R.

14   § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination of the

15   claimant's impairments meets or equals the severity of a listed impairment, she is disabled.  *Id.*

16   Otherwise, the analysis continues.  *See id.*

17          At step four, the ALJ considers the claimant's residual functional capacity ("RFC") in light

18   of her impairments and whether she can perform past relevant work.  20 C.F.R.

19   § 404.1520(a)(4)(iv) (citing 20 C.F.R. § 404.1560(b)).  If the she can perform past relevant work,

20   she is not disabled.  *Id.*  If she cannot perform past relevant work, the ALJ proceeds to the final

21   step.  *See id.*

22          At step five, the burden shifts to the Commissioner to demonstrate that the claimant, in

23   light of her impairments, age, education, and work experience, can perform other jobs in the

24   national economy.  *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997); *see also* 20 C.F.R.

25   § 404.1520(a)(4)(v).  If the Commissioner meets this burden, the claimant is not disabled.  *See*

26   20 C.F.R. § 404.1520(f).  Conversely, she is disabled and entitled to benefits if there are not a

27   significant number of jobs available in the national economy that she can perform.  *Id.*

28

United States District Court
Northern District of California

### 2.   Determining Disability Where There Is Evidence of Mental Impairment

The Commissioner issued 20 C.F.R. § 404.1520a to supplement the five-step evaluation process where, as here, the claimant alleges that one or more mental impairments prevents her from working.  See 20 C.F.R. §§ 404.1520a, 416.920a; *see also Maier v. Comm'r of Soc. Sec.*, 154 F.3d 913, 914–15 (9th Cir. 1998) (per curiam); *Clayton v. Astrue*, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011).  These regulations direct an ALJ to evaluate a claimant's pertinent symptoms, signs, and laboratory findings to determine whether she has a medically determinable mental impairment.  *See* 20 C.F.R. § 404.1520a(a).  In conducting this inquiry, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the claimant's symptoms, and how her functioning may be affected by factors that include, but are not limited to, chronic mental disorders, structured settings, medication, and other treatment.  *See* 20 C.F.R. § 404.1520a(b)–(c)(1).  The ALJ then assesses the degree of the claimant's functional limitations based on those medically determinable mental impairments.  *See* 20 C.F.R. § 404.1520a(c)(2).

Although analysis under 20 C.F.R. § 404.1520a includes an assessment of the claimant's limitations and restrictions, it is not an RFC assessment.  *See* SSR 96-8p, 1996 WL 374184.  Rather, it is a component of analyzing the severity of mental impairments at steps two and three of the sequential evaluation process.  *Id.*  The mental RFC assessment used at steps four and five requires a more detailed assessment in which the ALJ must address the various functions that are contained in the broad categories found in Paragraphs B and C of the adult mental disorders listed in Listing 12.00 of the Listing of Impairments.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

### C.   Procedural History

Swan applied for Social Security Disability Insurance benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act.  AR at 209–224.  She alleged that PTSD, depression, insomnia, and injuries to her back, neck, knees, and hips had rendered her disabled on September 16, 2011.  *Id.*  The Social Security Administration ("SSA") denied these applications initially and on reconsideration.  *Id.* at 95–150.  An ALJ convened a hearing at Swan's request and, as described below, determined that she was not disabled.  *Id.* at 11–94, 166–

75. Swan requested review of the ALJ's determination by the SSA Appeals Council. *See id.* at 1–9. After the Appeals Council denied her request, Swan initiated this action for review under 42 U.S.C. §§ 405(g), 1383(c)(3). *See id.*; Complaint, dkt. no. 1.

### 1. The Hearing

The ALJ convened the hearing on December 6, 2013. *See* AR 30–94. Four witnesses testified: Swan, medical expert Dr. Eric Schmitter (an orthopedic surgeon), medical expert Dr. Herbert Tanenhaus (a psychiatrist), and vocational expert Malcom Brodzinsky (the "VE"). *See* AR 31.

#### a. Swan's Testimony

Addressing her work history, Swan testified that she was a full-time homemaker from 1998 to 2004. *Id.* at 78–80. In 2004, she started working in a laundry for a nonprofit organization. *Id.* After she experienced a back injury while working, she transitioned to a service-coordinator role. *Id.* at 80.

Most recently, Swan had worked as a part-time cashier, working twelve to sixteen hours per week. *Id.* at 37–38. She left the job in October 2012 because it required too much standing, which caused pain to the right side of her body, and she did not receive enough break time to take her pain medication. *Id.* Working more than four or five hours caused her extreme pain that made her unable to walk the following day. *Id.* Swan did not seek other work after leaving the cashier position. *Id.* at 38–39.

After leaving the cashier position, Swan spent her time addressing her health. *Id.* at 39. Her physical issues occasionally caused her pain that prevented her from walking and leaving her home. *Id.* Swan's knee problems also caused her leg to "give out." *Id.* at 41. Swan also saw a psychiatrist and a therapist, although she acknowledged while testifying that those appointments did not prevent her from working. *Id.* at 40.

Swan testified that she was not working because "some days I can walk and some days I can't." *Id.* She explained that employers would not accommodate her need to rest her knee for twenty-four hours after a day of work. *Id.* She also explained that constant lower back pain and recurring pain in her knees and ankles contributed to her inability to work. *Id.* at 45–46.

United States District Court
Northern District of California

1    Swan's mental health issues consisted of depression, insomnia, PTSD, bipolarity, and

2    agoraphobia. *Id.* at 47. Her depression occasionally caused her to stay in bed all day. *Id.* at 51.

3    Her PTSD had originated after from events in 2005 and 2006. During that period, her boyfriend

4    abused her, her mother died in her presence, her brother was murdered, and her father and

5    grandmother died. *Id.* at 49–50. Her bipolarity and agoraphobia had been recently diagnosed and

6    were related to her depression. *Id.* at 47. These mental health issues and the violence in her

7    neighborhood often prevented her from leaving her apartment. *Id.* at 50.

8        At the time of the hearing, Swan's medication included Norco, muscle relaxers, Motrin,

9    Vicodin, and medication for her insomnia. *Id.* at 42, 50.

10                          b.   Dr. Eric Schmitter's Testimony

11       After noting that he had received few orthopedic records, Dr. Schmitter started his

12   testimony by discussing Swan's back pain. *Id.* at 58–59. He explained that Drs. Naraghi and

13   Nguyen had conflicting opinions and noted that the MRIs that both doctors discussed were not in

14   the record. *Id.* at 59–60.

15       Dr. Schmitter opined that Swan had a mild to moderate form of degenerative disc disease

16   without demonstrable neurologic deficits. *Id.* at 62. He also testified that he had not found

17   anything in the record regarding Swan's knees or ankles. *Id.* Dr. Schmitter concluded that Swan's

18   medical issues did not meet or equal a listing in the Social Security Act. *Id.* He specifically noted

19   that Swan had no record of joint or motor problems, could lift twenty pounds occasionally and ten

20   pounds frequently, and could sit or walk for four-to-six hours in an eight-hour workday if she

21   received typical breaks. *Id.* at 62–63, 65.

22       On cross-examination, Dr. Schmitter addressed Swan's knees, explaining that he had not

23   been provided enough evidence to agree with a diagnosis of bilateral knees featuring internal

24   derangement. *Id.* at 67–69. He acknowledged that it was possible that she suffered from the

25   condition. *Id.* He further explained that her knee injuries could not be severe because a doctor

26   had recommended acupuncture as treatment. *Id.* at 68.

27                          c.   Dr. Tanenhaus's Testimony

28       Dr. Tanenhaus testified that Swan suffered from the medically determinable mental

impairments of MDD of moderate severity and PTSD.  *Id.* at 71.  He opined that these

impairments did not separately or in combination render her disabled.  *Id.*  He explained that Swan

had a minor impairment in her daily-living activities and moderate impairments in her ability to

relate socially and maintain concentration, persistence, and pace.  *Id.* at 72–74.  Dr. Tanenhaus

also testified that Swan was capable of complex work.  *Id.* at 73.

### d.   Vocational Expert Malcom Brodzinsky's Testimony

Early in the VE's testimony, the ALJ asked him to assume the following hypothetical

person:

> [A] hypothetical person [of the] same age, education, and experience
> as [Swan], essentially at the light level where the person's . . . able
> to lift and carry up to 10 pounds frequently and 20 pounds
> occasionally; should be able to sit for up to 6 out of 8 hours, also
> with normal breaks in each position; posturals are occasional;
> however, reaching and manipulation are unlimited at all, but there is
> a preclusion from climbing ladders, ropes, or scaffolds; from work
> at unprotected heights; or around hazardous, moving machinery; and
> finally, there's a precautionary restriction from exposure to extreme
> cold. And then from a mental perspective, the hypothetical person is
> able to engage in the full range of simple, repetitive through
> complex work; and can engage on a frequent basis with coworkers;
> may also be able to do frequent contact with the public, but where
> it's limited to non-confrontational work . . . ; supervisory contact
> can also be frequent but without major confrontation or . . . major
> correction.

*Id.* at 87–88.  The ALJ then asked the VE if Swan would be capable of performing her past work

or any other work in the national economy.  *Id.* at 88, 90–91.

The VE opined that Swan was incapable of returning to her prior work as a cashier,

suggesting that it required too much interaction with the public.  *Id.* at 89.  He also opined that

Swan could perform the work of her past positions as a laundry worker and a laundry supervisor.

*Id.*  Turning to other work, the VE testified that Swan could "perform the full range of unskilled,

light bench work," which included the work of a bench assembler and a small products assembler.

*Id.* at 90–91.

On cross-examination, Swan's counsel asked to the VE to add a limitation to the ALJ's

hypothetical: being off task for twenty percent of each workday due to pain.  *Id.* at 92.  The VE

responded that being off task for an hour and a half during an eight-hour workday would preclude

United States District Court
Northern District of California

United States District Court
Northern District of California

1   that hypothetical person from obtaining employment.  *Id.* at 93.

2        **D.**    **The ALJ's Decision**

3        As required by the Commissioner's regulations, the ALJ applied the sequential five-step

4   analysis to evaluate Swan's applications for disability benefits.  AR at 11–29.  The ALJ decided

5   that Swan had "not been under a disability within the meaning of the Social Security Act from

6   September 16, 2011, through" December 31, 2013 (the date of his decision), and outlined his five-

7   step analysis as follows.  *Id.* at 15–25.

8        **1.  The First Three Steps**

9        The ALJ first found that Swan had not engaged in substantial gainful activity since the

10  alleged onset date of September 16, 2011.  AR at 16.  The ALJ acknowledged that Swan had

11  worked in October 2012, but determined that it did not constitute substantial gainful activity.  *Id.*

12       At step two, the ALJ found that Swan had the following severe impairments: (1) lumbar

13  spine degenerative disc disease with right lower extremity radiculopathy; (2) moderate major

14  depressive disorder; (3) PTSD; (4) and obesity.  *Id.* at 16–17.  He explained that these impairments

15  caused more than minimal limitation to Swan's ability to perform basic work activities.  *Id.* at 17.

16  He observed that the medical experts had testified that Swan's impairments were not severe.  *Id.*

17  He also observed that the psychiatric medical expert had testified that the medical record did not

18  support a diagnosis of bipolar affective disorder.  *Id.*

19       Turning to the third step, the ALJ determined that Swan's impairments, considered

20  separately or in combination, did not meet or equal the severity of an impairment listed in the

21  Commissioner's regulations.  *Id.*  The ALJ reasoned that the medical experts' testimony supported

22  this finding.  *Id.*  The ALJ further found that Swan's mental impairments were not disabling under

23  the criteria provided in Paragraphs B and C of the applicable listings in the Listing of

24  Impairments.  *Id.*

25       **2.  Step Four: Residual Functional Capacity and Past Work**

26       The ALJ found at step four that Swan had the RFC to perform light work.  AR at 18 (citing

27  20 CFR §§ 404.967(b), 404.1567(b)).  He outlined Swan's work limitations as follows:

28            lifting  and  carrying  20  pounds  occasionally  and  10  pounds

11

1
2
3
4
5

frequently, standing and walking 4-6 hours each in an 8 hour day, sitting 6 hours in an 8 hour day, all with normal breaks; occasional postural activities except no climbing ladders/ropes/scaffolds. No exposure to extreme cold and no work at unprotected heights or around hazardous moving machinery. She is capable of the full range of simple tasks through complex work, is limited to frequent interactions with coworkers and the public in non-confrontational work, and with supervisors frequently in work without major confrontations or corrections, and may perform low stress work, defined as few changes in the work or its setting.

6   *Id.*

7       The ALJ explained that he had determined Swan's RFC according to a two-step process.

8   *Id.* at 19.  At the first step, he found that Swan's alleged impairments—PTSD, depression,

9   insomnia, and injuries to her back, neck, knee, and hip—could cause the symptoms that she had

10  described in her testimony.  *Id.*  At the second step, he found that Swan's "statements concerning

11  the intensity, persistence and limiting effects of these symptoms are not entirely credible."  *Id.*

12  The ALJ concluded that the record supported "a finding that [Swan's] impairment-related

13  limitations and pain would not preclude her from performing the limited range of light work

14  outlined in the residual functional capacity."  *Id.*

15      Explaining that conclusion, the ALJ addressed Swan's physical impairments.  *Id.*  He

16  summarized the records and clinical findings in Swan's medical history, specifically describing

17  Dr. Morley's findings, Dr. Nguyen's opinion (which he gave significant weight), and the

18  testimony of medical expert Dr. Eric Schmitter (which he gave great weight).  *Id.* at 20–21.  The

19  ALJ also mentioned that there were references to MRIs conducted in 2009 and 2011 that were

20  absent from the record, but suggested that those MRIs would support his decision.  *Id.* at 19–20.

21      Addressing Swan's mental impairments, the ALJ observed aspects of Swan's outpatient

22  therapy and psychiatric treatment, including her complaints of recurring panic attacks, stress, and

23  depression that resulted from the abuse of her daughter; her prescriptions for Citalopram and

24  Ambien; and her November 2011 diagnosis of MDD, accompanied by a GAF range of 50 to 55.

25  *Id.* at 21–22.  The ALJ specifically addressed the opinions of Drs. Eggert and Welchel, explaining

26  that he gave both "significant weight because [their opinions are] consistent with the objective

27  evidence."  *Id.* at 22.  The ALJ also analyzed the testimony of psychiatrist medical expert Dr.

28  Tanenhaus and explained that he gave "this opinion great weight because Dr. Tanenhaus had the

United States District Court
Northern District of California

12

opportunity to review the full medical record and to listen to all of [Swan's] testimony." *Id.* at 23.

The ALJ next turned to the credibility of Swan's testimony. *Id.* He explained that the conservative treatment that she had received was not typical of a disabled person and suggested that her subjective complaints of pain were overstated. *Id.* In reaching this finding, the ALJ noted that, regarding Swan's physical impairments, there was no evidence that she had received treatment with particular pain control modalities. *Id.* He also reasoned that her use of prescribed medication did not indicate that she suffered from an impairment "which is more limiting than found in the decision." *Id.* Regarding Swan's mental impairments, the ALJ reasoned that she had not been psychiatrically hospitalized, had reported improvement from medication, and independently performed basic daily-living activities. *Id.* The ALJ further stated that Swan "was able to work part-time with her impairments, which suggest [*sic*] those impairments were not as disabling as alleged." *Id.* at 23.

The ALJ then determined that Swan retained the RFC to perform her past work as a laundry worker and a supervisor of laundry services. *Id.* at 23–24. The ALJ also noted that the VE had testified that Swan was unable to perform her past work as a cashier. *Id.* at 24.

### 3. Step Five: Other Work

The ALJ made the alternative determination that Swan also had the RFC to work in other jobs that existed in the national economy. AR at 24. In reaching this determination, the ALJ observed that Swan's ability to perform all or substantially all of the requirements of light work was impeded by her limitations. *Id.* The ALJ reasoned that the VE had considered those limitations and testified that Swan remained able to perform the requirements of a bench work assembler and small parts assembler. *Id.* at 24–25. The ALJ concluded that Swan was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate . . . ." *Id.* at 25.

### E. The Motions

In her Motion for Summary Judgment, Swan initially contends that the ALJ erroneously failed to provide clear and convincing reasons for rejecting the opinions of Drs. Maki, Rena, Naraghi, Morley, Eggert, and Welchel. Plaintiff's Motion for Summary Judgment ("Pl. Mot.,"

United States District Court
Northern District of California

dkt. no. 18) at 9–10.  Swan argues that this alleged error rendered erroneous the ALJ's assessment of her RFC.  *Id.* at 10.

Swan next contends that the ALJ erred in determining that she had the mental RFC to perform simple and complex work and could frequently interact with coworkers, the public, and supervisors in nonconfrontational settings.  *Id.* at 12.  In support of this contention, she argues that the ALJ failed to consider her particular moderate impairments as determined by Drs. Eggert, Welchel, and Tanenhaus respectively, or include those impairments in the hypothetical questions that he posed to the VE.  *Id.*  She specifically notes that the ALJ did not address Dr. Eggert's opinion "that it is not likely that Ms. Swan could tolerate the mental demands associated with work without deterioration or decompensation of mental health."  *Id.* (citing AR at 393).  Swan also argues that the ALJ erroneously failed to include her limitations, as determined by two state agency psychologists who reviewed her medical records, that she was limited to one-to-two step instructions and should avoid public contact.  *Id.* at 14.

Swan further contends that the ALJ erroneously determined that she retained the physical RFC to perform light-level work.  *Id.*  In support of this contention, she argues that the ALJ improperly relied on Dr. Schmitter's testimony because it was not supported by the medical record due to his failure to consider neurological deficits and bilateral knee impairments that were noted in the opinions of other doctors.  *Id.* at 16–17.  She also asserts that the ALJ's failure to obtain the 2009 and 2011 MRIs of her lumbar spine, which were missing from the record, constituted prejudicial error.  *Id.* at 16 n. 7.  She further argues that the ALJ erroneously failed to properly consider her limitations as found by Drs. Maki, Naraghi, Rena, and Morley and as she had described in her testimony.  *Id.* at 18.  Finally, she argues that the VE's testimony has no evidentiary value because the ALJ's RFC assessment and the hypothetical questions that he posed did not include all her limitations.  *Id.*

Lastly, Swan contends that the ALJ failed to provide specific, clear, and convincing reasons for rejecting her testimony.  *Id.*  She argues that the ALJ's reasons for discrediting her fell short because it is "well settled that an ALJ may not discredit testimony because the degree of limitations are not supported by the medical evidence."  *Id.* at 19.  She further asserts that the

United States District Court
Northern District of California

14

ALJ's finding that she did not receive medical treatment typical of a totally disabled individual is legally insufficient.  *Id.*  She also argues that none of the ALJ's other reasons for discrediting her testimony met the clear and convincing standard.  *Id.* at 19–22.

Swan concludes that the proper remedy for the ALJ's alleged errors is a remand with instructions to award her benefits.  *Id.* at 23–25.  Alternatively, she requests a remand for further administrative proceedings.  *Id.* at 25.

In opposition, the commissioner responds that the ALJ properly assessed the medical evidence in the record, stating that an "ALJ need not discuss every piece of evidence" in a disability determination.  Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion ("Opp'n," dkt. no. 21) at 2–3.  The Commissioner specifically argues that Swan misrepresented the opinions of Drs. Rena and Naraghi in her motion.  *Id.* at 4.  The Commissioner also argues that the ALJ did not reject the opinions of Drs. Eggert, Welchel, and Tanenhaus, but rather gave them great weight.  *Id.*  The Commissioner further claims that these opinions support the ALJ's RFC determination.  *Id.*  The Commissioner also argues that the ALJ's failure to discuss Dr. Maki's opinion was harmless, asserting that it was not supported by objective medical evidence and was contrary to the opinions of consultative examiner Dr. Nguyen and medical expert Dr. Schmitter.  *Id.* at 5.  The Commissioner also argues that Swan's contention that the ALJ erroneously failed to adopt the state agency examiners' severity analyses is legally incorrect and that an ALJ's failure to discuss state agency opinions does not constitute reversible error.  *Id.* at 6.

The Commissioner also contends that the ALJ properly found that Swan was not credible, arguing that the medical evidence in the record did not support the extent to which she alleged functional limitations that were more restrictive than the ALJ's RFC determination.  The Commissioner specifically asserts that three consultative doctors and two testifying medical examiners had opined that she was capable of working.  *Id.* at 6–7 (citing AR at 19-20).  The Commissioner also argues that the ALJ's decision was properly supported by substantial evidence in three respects: (1) Swan had little restriction in performing daily activities; (2) the treatment that she had received was conservative; and (3) she had worked part-time after her alleged disability onset date.  *Id.* at 7–8.

United States District Court
Northern District of California

1    The Commissioner concludes that the ALJ's decision should be affirmed.  *Id.* at 8.

2    Alternatively, the Commissioner argues that, should the Court determine the ALJ erred, remand

3    for further proceedings is the appropriate remedy.  *Id.*

4    In reply, Swan asks the Court to reject the Commissioner's argument that the ALJ properly

5    assessed the medical evidence in the record.  Plaintiff's Reply to Defendant's Cross-Motion and

6    Opposition (dkt. no. 22) at 2.  She argues that the Commissioner's assertion that Drs. Rena and

7    Naraghi were one-time examiners is factually incorrect.  *Id.* at 3.  She also contests the

8    Commissioner's argument that the omission of Dr. Maki's opinion from the ALJ's analysis was

9    harmless.  *Id.* at 4–5.  Finally, Swan asserts that the Commissioner's relies on inapplicable

10   authority to support the contention that the ALJ was not required to seek the missing MRI reports.

11   *Id.* at 5–7.

12   Swan also asks the Court to reject the Commissioner's argument that the "ALJ need not

13   include an impairment in his . . . RFC finding that does not in combination with other

14   impairments, significantly limit the claimant's ability to work."  *Id.* at 8 (quoting Opp'n at 4).

15   Swan asserts that this argument fails to address the ALJ's disregard of part of Dr. Eggert's opinion

16   and several of her moderate impairments.  *Id.* at 8–9.  She also asserts that the Commissioner is

17   factually incorrect in arguing that the ALJ considered the state agency opinions and legally

18   incorrect in asserting that the ALJ need not specifically address those opinions in his RFC

19   analysis.  *Id.* at 10–11.

20   Finally, Swan reiterates her contention that the ALJ failed to offer clear and convincing

21   reasons for rejecting her testimony.  *Id.* at 12.  Addressing the Commissioner's arguments to the

22   contrary, she first asserts that a lack of medical evidence supporting a claimant's testimony may

23   not serve as the sole basis for rejecting that testimony.  *Id.*  She next asserts that the Commissioner

24   failed to cite to substantial evidence in the record in support of the ALJ's findings.  *Id.* at 13.  She

25   further asserts that there is no such evidence and that the ALJ did not find, as the Commissioner

26   contends, that her daily activities were in fact transferrable to the workplace.  *Id.*  She responds to

27   the Commissioner's contention that she received conservative treatment for her impairments by

28   asserting that her prescription for Vicodin is disruptive due to its side effects and supports her

testimony that she spends much of the day in bed.  *Id.* at 13–14.  She also asserts that her brief

part-time job bolsters rather than undermines her credibility, pointing out that the one-month job

was an unsuccessful attempt at working in a position that did not constitute substantial gainful

activity.  *Id.* at 14.

## III.    ANALYSIS

### A.    Legal Standard

When reviewing the Commissioner's decision to deny benefits, the Court "may set aside a

denial of benefits only if it is not supported by substantial evidence or if it is based on legal error."

*Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d

1064, 1066 (9th Cir. 1997)) (quotation marks omitted); *see also* 42 U.S.C. § 405(g).  Substantial

evidence must be based on the record as a whole and is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389,

401 (1971).  Substantial evidence "must be 'more than a mere scintilla,' but may be less than a

preponderance."  *Molina v. Astrue*, 674 F.3d 1104, 1110–11 (9th Cir. 2012) (quoting *Desrosiers v.

Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)).  Even if the

Commissioner's findings are supported by substantial evidence, "the decision should be set aside

if the proper legal standards were not applied in weighing the evidence and making the decision."

*Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

The Court must review the record as a whole, considering the evidence that supports and

the evidence that detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273,

1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).  "Where

evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that

must be upheld."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  Courts "are constrained

to review the reasons the ALJ asserts" and "cannot rely on independent findings" to affirm the

ALJ's decision.  *Connett v. Barnhart*, 340 F.3d 871, 874 (citing *SEC v. Chenery Corp.*, 332 U.S.

194, 196 (1947)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions,

the Court may remand for further proceedings or for a calculation of benefits.  *See Garrison v.*

1    *Colvin*, 759 F.3d 995, 1019−21 (9th Cir. 2014).

2    **B.    The ALJ's Residual Functional Capacity Assessment Contained Errors**

3    **1.  Physical Residual Functional Capacity**

4    Swan contends that that the ALJ improperly rejected the opinions of several doctors who

5    evaluated her back, hip, knee, and ankle injuries.  *See* Pl. Mot. at 9–11.  Although it is unclear

6    whether the ALJ in fact rejected those opinions, his failure to properly consider the opinions of at

7    least two doctors rendered his RFC determination erroneous.

8    First, the ALJ failed to discuss the evaluations and opinions of Dr. Rena, who provided

9    extensive treatment for Swan's injuries—not a single examination as the Commissioner

10   incorrectly claims.  *See* AR at 345–48, 357–59, 361–64, 367–70, 390; *see also* Comm'r Mot. at 4.

11   "By rule, the [SSA] favors the opinion of a treating physician over non-treating physicians."  *Orn*

12   *v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2011) (citing 20 C.F.R. § 404.1527).  It follows that an ALJ

13   must address the opinion of a treating physician in a disability determination.  *See* § 404.1527(c)

14   ("Regardless of its source, we will evaluate every medical opinion we receive.").

15   Here, the ALJ did not mention treating physician Dr. Rena in his decision.  The ALJ

16   minimally cites to records of Dr. Rena's evaluations for the purpose of describing some of Swan's

17   medical history.  *See* AR at 20.  However, such cursory citation does not constitute the

18   consideration of Dr. Rena's medical opinions, let alone the acceptance or rejection of those

19   opinions, as the Commissioner's regulations require.  *See* 20 C.F.R. § 404.1527(c)(2) ("We will

20   always give good reasons in our notice of determination or decision for the weight we give your

21   treating source's opinion.").  Thus, the ALJ's failure to address Dr. Rena's opinions was error.

22   Notably, the Commissioner fails to affirmatively argue that the ALJ properly considered

23   Dr. Rena's opinion.  The Commissioner merely asserts that Swan decontextualized sentences

24   contained within Dr. Rena's opinions and that records of Dr. Rena's examinations ultimately

25   suggest that Swan's physical impairments are minor.  *See* Comm'r Mot. at 4.  Whether the records

26   of Dr. Rena's treatment ultimately support the ALJ's decision is of no import.  The Court cannot

27   independently assess those records.  *Cf. Connett*, 340 F.3d at 874 (holding that a reviewing district

28   court "cannot rely on independent findings" to affirm an ALJ's decision).

United States District Court
Northern District of California

Second, the ALJ recounted some of Dr. Morley's observations, but conspicuously omitted vital aspects of his medical opinion. *See* AR at 20. Dr. Morley—who examined Swan in person and extensively reviewed her medical record—stated, "The patient will not be able to return to her pre-injury occupation." AR at 410–17, 421–25. This statement does not constitute a medical opinion for the purpose of a disability review. *See* 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner."). However, it is the conclusion at which Dr. Morley arrived after thoroughly outlining his medical opinion. *See* AR at 410–16. The ALJ was therefore obligated to accept or reject Dr. Morley's opinion and address the extent to which it conflicted with those of other physicians. *See Carmickle v. Comm'r, Soc. Security Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). The ALJ did not do so, failing to interpret Dr. Morley's opinion and indicate whether he accepted or rejected it. *See* AR at 20–21.

Furthermore, Dr. Morley diagnosed Swan with internally deranged bilateral knees and recommended that Swan receive orthopedic treatment for the condition. *Id.* at 424. Dr. Morley also opined that Swan's case was "complex and extraordinary," featuring symptoms that exceeded those typical of a person with Swan's diagnoses. *Id.* at 416. Although the ALJ noted the bilateral knee diagnosis in his decision, he failed to assess the extent to which Swan's knee condition constituted an impairment. *See id.* at 20. He likewise did not address Dr. Morley's opinion that Swan's case was complex and extraordinary. It is therefore questionable whether the ALJ properly assessed Swan's RFC.

Dr. Morley's opinion also undermines Dr. Schmitter's testimony, rendering it of questionable evidentiary value. Dr. Schmitter stated at the outset of his testimony that there were "little orthopedics in the record." AR at 58. In contrast, Dr. Morley provided an extensive summary of Swan's medical history, including the orthopedic treatment that she had received. *See* AR at 411–25. Dr. Schmitter also testified that there was no documentation of a knee impairment in the record. AR at 62, 66. On cross-examination, when he was directed to Dr. Morley's diagnosis, he stated that it was possible Swan had a problematic knee condition. *Id.* at 66–70. He further testified that he "might decrease her standing and walking capacity if [he] knew that she

had significant problems in her knees." AR at 66–70.  The ALJ gave great weight to Dr.

Schmitter's opinion, finding that it was "consistent with the record as a whole."  AR at 21.

However, Dr. Schmitter's testimony is clearly inconsistent with Dr. Morley's medical opinion,

which was entitled to greater weight under the Commissioner's regulations, and Dr. Schmitter's

discussion of Swan's knee condition was mere speculation.  The ALJ therefore erred in relying on

it without first reconciling Dr. Morley's medical opinions with the record.  *Cf. Lester v. Chater*, 81

F.3d 821, 830–31 (9th Cir. 1995) (as amended 1996) ("[T]he opinion of an examining doctor,

even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that

are supported by substantial evidence in the record.").

### 2.  Mental Residual Functional Capacity

Swan contends that the ALJ failed to properly consider Dr. Eggert's opinion regarding the

effect that Swan's mental impairments had on her RFC.  Pl. Mot. at 12.  While the Commissioner

is correct that the ALJ did not in fact reject Dr. Eggert's opinion, the ALJ's omission of a crucial

part of that opinion from his analysis was error.

The Commissioner's regulations required the ALJ to evaluate every medical opinion in the

record and, to the extent relevant evidence was inconsistent, weigh that evidence in determining

whether Swan was disabled.  *See* 20 C.F.R. § 404.1520b(b) ("If any of the evidence in your case

record, including any medical opinion(s), is inconsistent, we will weigh the relevant evidence and

see whether we can determine you are disabled based on the evidence we have.").  Here, the ALJ

stated that Dr. Eggert's opinion was consistent with the objective evidence contained in the record

and gave it significant weight in determining that Swan was not disabled.  However, the ALJ did

not discuss Dr. Eggert's opinion that Swan's "*ability to tolerate the mental demands associated*

*with work, or work-like settings, without deterioration or decompensation is not likely*.

Consequently . . . although she appears able to be successful at maintaining the skills required to

carry out tasks in a work setting, *her overall performance and ability to maintain relationships at*

*work may be negatively impacted by her mental health*."  AR at 393 (emphasis added).  This

statement clearly constituted evidence that Swan could be disabled.  *See Lester*, 81 F.3d at 833

(citing 20 C.F.R. § 404.1512(a); *Leidler v. Sullivan*, 885 F.2d 291, 292 n. 3 (5th Cir.1989); *Poulin*

United States District Court
Northern District of California

1  *v. Bowen*, 817 F.2d 865, 875 (D.C.Cir.1987)) ("In evaluating whether the claimant satisfies the

2  disability criteria, the Commissioner must evaluate the claimant's 'ability to work on a sustained

3  basis.'  [Citation.]  Occasional symptom-free periods—and even the sporadic ability to work—are

4  not inconsistent with disability.")

5       The ALJ's disregard of this part of Dr. Eggert's medical opinion demonstrates that he did

6  not "weigh" the relevant evidence.  He considered those portions of Dr. Eggert's opinion that

7  supported his determination that Swan was not disabled, and failed to address the portion that

8  detracted from that determination.  The Commissioner's regulations do not permit this selective

9  interpretation of the record.  *See* 20 C.F.R. §§ 404.1520b(c), 404.1527(c).

10       **C.**    **The ALJ Improperly Determined that Swan's Testimony Was Not Credible**

11       Swan contends that the ALJ improperly determined that her testimony was not credible.

12  *See* Pl. Mot. at 18–22.  The Court agrees.

13       To reject a claimant's testimony, an ALJ must provide specific and cogent reasons for

14  determining that it lacks credibility.  *Lester*, 81 F.3d at 834.  Furthermore, if a claimant produces

15  medical evidence of an impairment, the ALJ "may not discredit the claimant's testimony as to

16  subjective symptoms merely because they are unsupported by objective evidence."  *Id.*  In such

17  circumstances, "the ALJ must identify what testimony is not credible and what evidence

18  undermines the claimant's complaints."  *Id.*  Here, the ALJ provided three reasons for determining

19  that Swan's testimony regarding the intensity, persistence, and limiting effects of her mental

20  impairments lacked credibility.  However, each reason rested on erroneous considerations.

21       First, the ALJ improperly reasoned that Swan's independence in basic activities of daily

22  living supported his determination that her testimony lacked credibility.  AR at 23.  The ALJ

23  found that Swan was only mildly restricted in her daily-living activities, citing the opinions of Drs.

24  Eggert, Welchel, and Nguyen.  *Id.* at 17.  However, Dr. Eggert's opinion on this subject was

25  objective evidence to the contrary.  *See id.* at 391–92.  Specifically, she observed that Swan

26  reported being "independent for basic activities of daily living such as dressing, bathing, light

27  cooking, shopping, and light household chores.  However, . . . she report[ed] that her mental health

28  symptoms routinely interfere with her ability to carry out her daily tasks, and instead she often

remains in bed until her children are home." *Id.* at 391–92.  From these reports, Dr. Eggert opined that Swan's "symptoms cause clinically significant distress and interfere with . . . activities of daily living." *Id.* at 392.  That opinion, in conjunction with Dr. Eggert's opinion that Swan lacked "the ability to tolerate the mental demands associated with work," constitutes objective evidence supporting Swan's testimony.  The conflicting objective evidence in the record required the ALJ to make specific findings and state clear and convincing reasons regarding Swan's credibility.  *See Smolen*, 80 F.3d at 1283–84.  The ALJ's general, conclusory credibility determination was insufficient.  *See* AR at 23.

Second, the ALJ improperly reasoned that Swan's brief work as a cashier supported the determination that she lacked credibility.  As the Ninth Circuit has explained:

> It does not follow from the fact that a claimant tried to work for a short period of time and, because of [her] impairments, *failed*, that [she] did not then experience pain and limitations severe enough to preclude [her] from *maintaining* substantial gainful employment. Indeed, we have suggested that similar evidence that a claimant tried to work and failed actually *supported* [her] allegations . . . .

*Lingenfelter v. Astrue*, 504 F.3d 1028, 1038.  The record suggests and Swan testified that she attempted to work as a cashier for a brief period, but her impairments caused her to stop working. The ALJ also acknowledged in his decision that Swan's work as a cashier did not constitute substantial gainful employment.  AR 16.  The ALJ further noted that the VE had opined Swan lacked the RFC to perform her past work as a cashier.  Thus, the record does not support the ALJ's inference that Swan's short-lived, part-time job as a cashier constituted evidence that her testimony was not credible.

Third, the ALJ's observations that Swan had not been psychiatrically hospitalized and had improved on her medication were not sufficient to support an adverse credibility finding.  The Ninth Circuit has "emphasized . . . it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. . . .  Reports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). As described above, the other reasons supplied by the ALJ for discrediting Swan's testimony were

United States District Court
Northern District of California

1    legally erroneous.  His observations that she had not been psychiatrically hospitalized and had

2    improved on medication were therefore insufficient—standing alone—to support his

3    determination that her testimony lacked credibility.

4        In sum, the ALJ erroneously determined that Swan's testimony regarding her mental

5    impairments lacked credibility.  The Court therefore finds it appropriate for the ALJ to reconsider

6    Swan's testimony in its entirety.

7        **D.    The Case Must Be Remanded for Further Proceedings**

8        Swan contends that, on the present record, the Court may reverse the Commissioner's

9    decision with instructions to calculate and award benefits.  Pl. Mot. at 22–25.  The Court is not

10   persuaded.  Further administrative proceedings would serve the following useful purposes.  *See*

11   *Garrison*, 759 F.3d at 1020–21.  First, the ALJ must reconsider Swan's RFC in light of the

12   medical opinions expressed by several doctors.  Second, the ALJ must reassess the credibility of

13   Swan's testimony.  Third, the ALJ should be permitted to reconsider the medical record in its

14   entirety and determine whether it should be augmented with the missing MRIs or any other

15   evidence relevant to the determination of Swan's disability status.  Fourth, the ALJ should be

16   permitted to reconsider Dr. Schmitter's testimony and determine whether additional expert

17   testimony on Swan's physical injuries would be relevant.  Lastly, the ALJ should be permitted to

18   reconsider whether Swan could perform other employment at step five of his analysis, which the

19   Court was not required to consider due to the errors in the ALJ's RFC analysis.

20   **IV.    CONCLUSION**

21       For the reasons stated above, the Court GRANTS in part and DENIES in part Swan's

22   Motion for Summary Judgment, DENIES the Commissioner's cross-motion, and REMANDS the

23   case for further proceedings consistent with this order.

24       **IT IS SO ORDERED.**

25   Dated: September 19, 2016

26   _____

27   JOSEPH C. SPERO
     Chief Magistrate Judge

28

United States District Court
Northern District of California